IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MEDFORD DIVISION

**THOMAS HARRY BRAY,**

Case No. 3:23-cv-00631-CL

Plaintiff,

v.                                                    **OPINION AND ORDER**

**STATE OF OREGON,** *et al,*

Defendants.

CLARKE, Magistrate Judge

Plaintiff Thomas Harry Bray ("Plaintiff") is currently in custody and housed at Deer Ridge Correctional Institution in Madras, Oregon (DRCI). He brings claims in this case related to the time he spent housed at DRCI, as well as Two Rivers Correctional Institution (TRCI). Full consent to magistrate jurisdiction was entered on April 2, 2025 (ECF #69). The case comes before the Court on the Defendants' motion for summary judgment (ECF #64). For the reasons below, the motion is GRANTED. Judgment shall be entered for the Defendants.

## INTRODUCTION

The record in this case is quite long, and at times tedious to recount and to read. The Court has thoroughly reviewed the facts presented by both sides, and the facts relevant to the Plaintiff's claims are discussed in detail in the Background section below. It is clear from a

review of Plaintiff's medical record prior to the applicable period, however, that he suffers from

a condition which is either rare or not well understood, even by specialists in the field. It took

many physicians, with many different specialties, many years to understand Plaintiff's condition

and the cause of his pain, let alone for these specialists to figure out how to properly treat the

condition and mitigate Plaintiff's pain. *See* Levi Decl. Ex. 1 at 8-9.[1] It is not at all surprising that

such a complex, misunderstood condition has continued to be misunderstood in the context of

ODOC's inmate medical system. The Court has immense sympathy for Plaintiff, and for all

inmates with serious medical issues who are forced to navigate the inefficient processes within

that system. The ODOC medical staff are also facing incredible challenges in trying to balance

the needs of their patients with the realities of prison policies and procedures.

      After a close review of the facts, the Court finds that the prison staff in this case who are

named defendants did not violate Plaintiff's Eighth Amendment rights. While Plaintiff faced

difficulties in accessing the treatments that he preferred to manage his complex pain, the prison

staff in this case either disagreed with the efficacy of his requests, or they were unable to grant

him full and complete access to those treatments at all times, due to various prison policies and

procedures. Other prison staff were sometimes unaware of certain permissions granted to

Plaintiff, and his access to these treatments was temporarily revoked. When Plaintiff's requests

were denied or his access temporarily revoked, the undisputed facts show that the defendants

were not deliberately indifferent to Plaintiff's serious medical needs. Similarly, Plaintiff's ADA

rights were not violated by the State of Oregon. The Defendants are entitled to summary

judgment in this case.

---

[1] In this report, Dr. James R. Kopp, M.D., reviewed Plaintiff's medical records and history dating back to 2004. Dr. Kopp lists nearly 30 appointments with more than 20 different doctors, four MRI scans, as well as numerous attempts at treatment, such as injections and biopsies, all within the first two years alone. The intensity of Plaintiff's medical treatment continued unabated for many years, until 2010, and the first note that a treatment had been moderately successful is not listed until December, 2009.

## LEGAL STANDARD

Summary judgment shall be granted when the record shows that there is no genuine dispute as to any material of fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). The moving party has the initial burden of showing that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc). The court cannot weigh the evidence or determine the truth but may only determine whether there is a genuine issue of fact. *Playboy Enters., Inc. v. Welles*, 279 F.3d 796, 800 (9th Cir. 2002). An issue of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

When a properly supported motion for summary judgment is made, the burden shifts to the opposing party to set forth specific facts showing that there is a genuine issue for trial. *Id.* at 250. Conclusory allegations, unsupported by factual material, are insufficient to defeat a motion for summary judgment. *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). Instead, the opposing party must, by affidavit or as otherwise provided by Rule 56, designate specific facts which show there is a genuine issue for trial. *Devereaux*, 263 F.3d at 1076. In assessing whether a party has met its burden, the court views the evidence in the light most favorable to the non-moving party. *Allen v. City of Los Angeles*, 66 F.3d 1052, 1056 (9th Cir. 1995).

## BACKGROUND

Most of the facts in the record are not in dispute, but the parties disagree about the legal implications of those undisputed facts. Any facts that are in dispute are identified as such and construed in favor of the Plaintiff as the non-moving party.

### a.  Plaintiff's disability, conviction, and housing history

Plaintiff completed medical school and was employed as an anesthesiology resident when he first experienced severe pain in 2004. Plaintiff then became a board-certified anesthesiologist and instructor at a community college. Before Plaintiff's incarceration, Plaintiff underwent twenty-eight surgeries, including four complex spine surgeries. In 2009, an Administrative Law Judge found Plaintiff was disabled and issued written findings that Plaintiff had been "under disability as defined in the Social Security Act since September 7, 2006." Levi Decl. Ex. 5.

Plaintiff initially entered the custody of the Oregon Department of Corrections (ODOC) on September 28, 2012, as a result of a conviction in Deschutes County Circuit Court. On September 3, 2013, James R. Kopp, MD, issued a written report discussing Plaintiff's medical history, and ultimately finding that Plaintiff was not capable of full-time work as an anesthesiologist. Decl. Levi Ex. 1.

After seeking post-conviction relief, Plaintiff was resentenced on February 4, 2019, and subsequently reentered ODOC custody on February 7, 2019. Decl. Brown, Ex. 103. Plaintiff was housed at Two Rivers Correctional Institution (TRCI) from October 30, 2012, until September 8, 2022, when he was transferred to Deer Ridge Correctional Institution (DRCI), and where he is currently incarcerated.

### b.  In-custody facts and allegations during the applicable period.[2]

On June 21, 2021, Plaintiff filed a Petition for Writ of Habeas Corpus in Umatilla County outlining his requests for bottom bunk/bottom tier, ice, a seat cushion, a back brace, to be

---

[2] As discussed below, due to the applicable statute of limitations, liability for Plaintiff's claims can only reach back as far as two years before the date Plaintiff filed his initial Complaint (ECF #1) in this federal case, which was May 21, 2023. Thus, the Court considers facts in the record beginning May 21, 2021. There are many facts in the record that took place prior to that date, but the Court omits them here and will only consider them to the extent that they provide material context for the parties' interactions during the applicable period.

designated sedentary work only, and a bottle of ibuprofen. Petition, *Thomas Harry Bray v. Erin Reyes*, Umatilla County Case No. 21CV25076.

On October 27, 2021, Plaintiff wrote to Health Services indicating he was having some back pain exacerbation, and he requested ice for 10 days; Defendant RN Marilyn Mendoza responded that Plaintiff had been signed up for sick call. Decl. Carter, Ex. 101 at 1. On October 31, 2021, Defendant Danette Berg, RN, saw Plaintiff at sick call and wrote that Plaintiff had injured his back in a sports injury in 2006. *Id.* at 2. She examined Plaintiff's back and found no redness or swelling; Plaintiff refused a hot pack and instead requested ice. *Id.* Berg authorized ice for 72 hours. *Id.* On November 9, 2021, Plaintiff wrote to Health Services to renew his ice authorization; Defendant Tina Hazen, RN, responded that his ice would not be renewed as it was only effective for 72 hours. *Id.* at 3.

Plaintiff was housed in a bottom tier and bottom bunk during all of his time in custody in 2021. Decl. Brown at ¶4, Ex. 103. On March 15, 2022, Plaintiff was moved to a top tier. *Id.* On March 27, 2022, he asked to see a provider, stating that he had been struggling with stairs, which were causing him 10/10 pain. Decl. Carter, Ex. 101 at 4. Defendant Patrick Maney, NP, ordered a bottom bunk and lower tier designation for one year, and on June 30, 2022, Plaintiff was moved to a lower tier. *Id.* at 5-6. Since then, Plaintiff has been assigned a bottom bunk on a lower tier.

Plaintiff wrote a kyte to Health Services on July 2, 2022, requesting ice twice a day for a few days, stating his back pain was horrific, that the ice machine on his unit was down, and that he did not have a plastic bag for ice. Defendant Berg responded, scheduling Plaintiff for sick call. *Id.* at 12. Plaintiff attended sick call on July 5, 2022, and the sick call nurse authorized ice for three times per day as needed. *Id.* at 7, 13. On July 22, 2022, Plaintiff reported he was having

an acute exacerbation of his back pain and requested his ice be renewed for 30 days; Defendant Hazen responded that ice was only effective for about three days. *Id*. at 16.

On July 29, 2022, Plaintiff sent a communication to Health Services stating he was having another back pain exacerbation, explaining that he had previously had four spine surgeries, "chronic neuropathic pain" and "failed back syndrome" as diagnoses, and that three treatments have been helpful in the past: (1) Motrin (ibuprofen) 800 mg, three times per day; (2) Lyrica 100 mg, three times per day; and (3) ice. *Id*. at 17. Plaintiff stated that all three of these treatments were currently being denied; he requested that the denials be reconsidered, noting that the naproxen did not help the pain, which was at 9/10. *Id*. On August 1, 2022, Defendant Maney responded that (1) ibuprofen is the generic for Motrin and is available on the unit, but that ODOC has other NSAIDs available if Plaintiff decided to try them; (2) long-term ice use required TLC[3] approval, which he would request the following day; (3) the request for Lyrica had been denied by the TLC, but TCAs and SNRIs were available to treat chronic pain; and (4) an x-ray for Plaintiff's lumbar spine would be ordered to compare to a 2020 x-ray. *Id*. at 17-18.

On August 3, 2022, Plaintiff wrote to Defendant Maney requesting an appointment for his horrific back/groin pain, reporting that he was experiencing allodynia and pain from light touch, which he had never before experienced in the 15 years of his pain. *Id*. at 20. Plaintiff reported that his family would pay for him to have a wheelchair, which would allow him to sit in the dayroom. *Id*. Plaintiff explained that he was a physician before prison, he was not a scammer trying to get something others did not have; rather, he was deeply anguished. *Id*. Defendant Hazen responded, stating that Plaintiff could discuss the concern at his next appointment. *Id*.

---

[3] The Therapeutic Level of Care ("TLC") Committee, is comprised of medical providers at TRCI, DRCI, and Eastern Oregon Correctional Institute, and it works on consensus. Decl. Levi, Ex. 13 at 185:2-19. Committee members must reach a collective decision to approve or deny medical requests. *Id*. at 185:17.

On August 9, 2022, the TLC Committee approved ice and a physical therapy evaluation for Plaintiff; TLC Committee members included Defendants Dr. Leland Beamer, MD, Michele Davies, NP, Dr. Warren Roberts, MD, and Dr. Peter O'Hanley, MD. *Id.* at 21-22.

On August 31, 2022, Plaintiff wrote to Health Services that he had been patiently waiting to see Defendant Maney regarding his worsening neuropathic pain, but he had learned that he did not have an appointment scheduled. *Id.* at 23. Plaintiff explained that his neuropathic pain remained horrific and was worsening, he was 100 percent unable to sit on the steel stools, and he was willing to pay out-of-pocket for a wheelchair. *Id.* Defendant Hazen responded reminding him that Defendant Maney had informed Plaintiff on July 31, 2022, that his care was in process with testing and imaging and asked Plaintiff to please be patient. *Id.*

On September 8, 2022, Plaintiff was transferred from TRCI to DRCI. Decl. Brown, Ex. 103. On September 11, 2022, Plaintiff wrote to DRCI Health Services explaining that he had just arrived after ten years at TRCI, but prior to prison he had been on Social Security Disability due to a spine injury and four spine operations. Decl. Carter, Ex. 101 at 24. Plaintiff requested assurances that he would not be made to work in the kitchen or any other job that he evaluated he would be unable to perform; Plaintiff stated that it was an egregious violation of the ADA to force him to work such a job. *Id.* Defendant Rebecca Stiff, RN, responded that Plaintiff had been signed up for sick call to discuss the issue. *Id.* On September 13, 2022, the sick call nurse noted that Plaintiff was concerned about working in the kitchen due to his chronic back pain and pain with lifting; the nurse noted that Plaintiff was able to bend and had a good range of motion. *Id.* at 25. The nurse told Plaintiff that he had a "no standing" work restriction in place and was not assigned to work in the kitchen but as a tutor. She also said that Plaintiff's restrictions for bottom bunk, bottom tier, and no stairs were effective through June 2023. *Id.* The nurse scheduled

Plaintiff to see a provider for chronic back pain and allodynia, and a plastic bag was provided to Plaintiff for ice on the unit. *Id.*

On October 5, 2022, Plaintiff had his appointment with Defendant Dr. Beamer who noted Plaintiff had "severe chronic pain," that his mattress was broken down, he could not sit on hard surfaces, and he moved slowly. *Id.* Beamer wrote an order for ice as needed for one year, an SI belt for one year, a new mattress, a seat cushion, as well as prescriptions for Lidocaine cream twice daily for 12 months and Meloxicam 7.5 mg twice daily for 12 months. *Id.* at 26. On October 6, 2022, Defendant Beamer wrote an order for Plaintiff to see him again in one month; the next day Beamer noted that he would need to request the SI belt and seat cushion via TLC. *Id.* Plaintiff wrote a kyte to R&D on October 5, 2022, about obtaining a new mattress but was directed back to medical. *Id.* at 27. On October 9, 2022, Plaintiff forwarded the response from R&D to Health Services to have the new mattress properly documented; Defendant Stiff responded that she had added the proper documentation. *Id.* at 28. On October 10, 2022, Medical Services Manager (MSM), Becky Carter, RN, clarified that R&D would still have to evaluate the mattress to ensure it fit their criteria and apologized for any confusion. *Id.* at 29, 34. On October 11, 2022, TLC reviewed Plaintiff's request for an SI belt and a seat cushion, and while the SI belt was approved, the seat cushion was not; Dr. Beamer did not indicate who the TLC attendees were. *Id.* at 30-32.

On November 9, 2022, Plaintiff saw Defendant Dr. Beamer for an appointment; Beamer noted that Plaintiff continued to have SI joint pain that significantly limited his activities. Beamer also noted that Plaintiff experienced significant relief from Mobic (meloxicam) and his SI belt. *Id.* Beamer wrote an order to provide Plaintiff a handout and schedule a follow up appointment in six weeks. *Id.* Plaintiff had his next appointment with Dr. Beamer on December

21, 2022, during which Plaintiff requested a SI joint fusion surgery and discussed his struggles walking on hills; Beamer noted no changes from Plaintiff's physical exam. *Id*. Beamer wrote an order to discuss the SI joint fusion with TLC and to schedule a follow up appointment in two months. *Id*. at 35. On December 27, 2022, TLC denied the SI joint fusion request but decided that Plaintiff could exchange his SI belt if wanted; Dr. Beamer again did not indicate who the TLC attendees were. *Id*. at 36.

On January 4, 2023, Plaintiff wrote to Dr. Beamer that he could no longer tolerate the steps and hills, requested to go with Beamer's idea of a wheelchair or a pusher, and stated that he did not know why he had been resisting that idea. *Id*. at 37. A nurse responded that Dr. Beamer was out on vacation and told Plaintiff to attend sick call until Beamer returned. *Id*. On January 9, 2023, Plaintiff attended sick call and inquired about ordering a new brace for his back; Plaintiff reported that he was planning for a wheelchair if his request for surgery was denied by TLC. *Id*. at 38. The sick call nurse noted that Plaintiff's gait was steady but slow and that Plaintiff denied pain at current. *Id*. On January 18, 2023, Plaintiff wrote to Dr. Beamer to follow up on requesting a wheelchair and a Chattanooga SI belt; Plaintiff was notified that Beamer was reviewing his request. *Id*. at 40-42. On January 19, 2023, Beamer wrote an order requesting the Chattanooga SI belt and a wheelchair from TLC. *Id*. at 35. On January 24, 2023, TLC approved the SI belt and denied the wheelchair; Defendants Roberts, Davies, Maney, and Beamer were TLC attendees. *Id*. at 43-44.

Plaintiff self-paid for the Chattanooga SI belt and received it on February 1, 2023. *Id*. at 38. He did not like it, returned it, and requested his old one back. *Id*. 45-46. On February 6, 2023, Plaintiff wrote to Health Services, noting it was his second time writing on the matter, and requested to self-pay for either a wheelchair or a walker with a thick cushion. *Id*. at 47.

Defendant Stiff responded that she would forward the kyte to Plaintiff's provider. *Id.* On

February 14, 2023, Dr. Beamer brought Plaintiff's request to self-pay for a seat cushion to TLC.

*Id.* at 48. TLC denied the request for the seat cushion, stating that there was no medical support

for the request; Defendants Roberts, Davies, Maney, and O'Hanley were TLC attendees. *Id.* at

48-50.

On February 16, 2023, Plaintiff wrote to Dr. Beamer detailing his struggle to sit on steel

stools attached to the dayroom tables and requested Beamer make a note in ODOC's computer

system or write him a card allowing Plaintiff to use one of the plastic chairs already located in

the dayroom by pulling it up to the dayroom table. *Id.* at 51-52. Plaintiff noted that the ADA

requires institutions make reasonable accommodations for people with disabilities. *Id.* A nurse

responded that the kyte would be forwarded on to Plaintiff's provider but noted that there was a

significant backlog; the nurse also asked if Plaintiff had contacted the ADA Coordinator about

his request. *Id.*

On March 25, 2023, Plaintiff wrote to Health Services stating that he was struggling with

the steep hill to and from the Education building as well as sitting on steel stools; Plaintiff stated

that he had filed an appeal of Health Services' decisions with the Jefferson County Court and

requested that in the meantime he have a "no work" restriction until the court could weigh in. *Id.*

at 53. A nurse responded that Plaintiff was scheduled for sick call. *Id.* On March 30, 2023,

Plaintiff attended sick call and reported that Defendant Dr. Beamer had been trying to help him,

but TLC kept denying everything. *Id.* at 38. Plaintiff also reported that his job had just been

changed from Education to being an orderly, which he was unable to do because he could not lift

mop buckets; Plaintiff noted that prior to being incarcerated he was on disability and that he

would rather not work at all. *Id.* Three days later, on April 2, 2023, Dr. Beamer ordered that

Plaintiff be restricted to "sedentary work only" for the following year. *Id*. at 49. On April 5, 2023, Plaintiff submitted a non-emergency health care request for chest pain that Plaintiff believed was due to anxiety regarding his back pain as every time he sat on a steel stool, he would experience 10/10 pain. *Id*. at 54. On April 6, 2023, Plaintiff was assessed at sick call, and the nurse reported that all his vitals were within a normal range and no cardiac signs or symptoms were observed; the nurse also scheduled Plaintiff's provider to review his x-ray per his request. *Id*. at 38-39, 54.

On April 13, 2023, Plaintiff's Petition for Writ of Habeas Corpus was filed in Jefferson County. *Bray v. Randall*, Jefferson County Case No. 23CV15221.

On April 28, 2023, Judge Robert Collins issued an Opinion in Plaintiff's Umatilla County habeas corpus proceeding, finding that Plaintiff had a serious medical need and that ODOC's conduct had risen to the level of deliberate indifference to Plaintiff's conditions. *Bray v. Reyes*, Umatilla County Case No. 21CV25076. The court ordered that Plaintiff be (1) permanently designated for a bottom bunk on a bottom tier; (2) allowed access to ice and bags necessary to apply ice upon request; (3) allowed a foam seat cushion to ease his pain; and (4) provided access to ibuprofen or Motrin for pain management. *Id*.

On May 7, 2023, Plaintiff wrote to Health Services requesting that his order for ice be renewed in ODOC's computer system as officers had recently been denying him plastic bags; Plaintiff also requested that his bottom bunk/bottom tier restriction be renewed. Decl. Carter, Ex. 101 at 55. Defendant Stiff scheduled a chart review for Plaintiff. *Id*. On May 11, 2023, Defendant FNP-C Katrina Meynig ordered access to ice bags for six months and documented Plaintiff's bottom bunk/bottom tier restriction for one year. *Id*. at 56. On May 20, 2023, Plaintiff wrote to Health Services that his ice had expired in the ODOC computer system and that he was

"being denied ice RIGHT NOW." *Id.* at 57. A nurse responded that Plaintiff's ice had been extended in the computer system through November 2023 and encouraged him to watch for call outs as he had a provider appointment very soon. *Id.*

On May 23, 2023, Plaintiff had an appointment with Defendant Meynig, at which Plaintiff reviewed types of seat cushions, again requested a wheelchair, and explained that ibuprofen was always running out on his unit. *Id.* at 39. Defendant Meynig told Plaintiff that she did not see his request of 600-800 mg tabs of Motrin (ibuprofen) as a formulary option; Plaintiff was also willing to try naproxen but wanted to try for the stronger strength Motrin first, which Defendant Meynig said she would investigate. *Id.* Defendant Meynig also informed Plaintiff that there would be provider-to-provider consult with ODOC's pain management specialist, who would make recommendations on how to best manage Plaintiff's chronic pain. *Id.* The same day, Defendant Meynig discontinued Plaintiff's Mobic (meloxicam) prescription. *Id.* at 56. On May 24, 2023, Plaintiff met with the nurse manager to self-select his seat cushion. *Id.* at 58. During the meeting, the nurse manager instructed Plaintiff not to take Mobic (meloxicam) and ibuprofen at the same time as they are contraindicated; Plaintiff responded that he had turned his Mobic (meloxicam) prescription in as he no longer took it. *Id.* The nurse manager further instructed Plaintiff to notify Health Services if ibuprofen was ever unavailable on his unit. *Id.* On May 25, 2023, Defendant Meynig ordered an office visit for Plaintiff to further discuss Motrin versus naproxen. *Id.* at 56. On May 26, 2023, Plaintiff's seat cushion was dispensed to him. *Id.* at 140.

On May 31, 2023, Plaintiff wrote to Defendant Meynig, referencing the Umatilla County court order, and made 17 formal requests: (1) release from custody; (2) referral to a chronic pain specialist and have all of his recommendations followed; (3) a prescription for Lyrica; (4) a wheelchair, wheelchair pusher, and an ADA compliant cell; (5) elevated storage in his cell; (6) a

"no work" restriction; (7) housed in a single cell on a mental health unit; (8) a new mattress

every six months; (9) an evaluation for an implantable nerve stimulator; (10) authorization to use

his chair in his cell, the dayroom, and the dining hall; (11) a CT scan of his pelvis; (12)

evaluation of a spine surgeon that specializes in SI joint fusions; (13) occupational therapy

consultation; (14) a prescription of Vicodin for breakthrough pain as needed; (15) a replacement

seat cushion—at his cost; (16) referral to an in-patient chronic pain center; and (17) an AIC to

help him carry his canteen back to his unit. *Id*. at 59-60. Defendant Stiff noted that she would

forward the kyte to the provider for review. *Id*. at 60. On June 5, 2023, Plaintiff sent the same

requests in addition to (18) the discontinuation of his NSAID prescription, via grievance. Decl.

Carter, Ex. 102 at 32-36. After the grievance was denied according to the rule that an AIC may

request review of only one matter, action, or incident per grievance, Plaintiff resubmitted the

grievance 18 times with the separate requests on June 28, 2023. *Id*. at 14-31.

On June 14, 2023, Plaintiff wrote to medical indicating that his unit was out of ibuprofen

and requesting information on who to kyte to have it replaced; the nurse responded that he was to

talk to the unit officer and that medical had nothing to do with the meds on the unit. Decl. Carter,

Ex. 101 at 61. On June 19, 2023, Plaintiff filed a grievance against Defendants Officer Ron

Schleis and Officer Hunter Stone alleging that they had searched his cell that day and confiscated

his plastic bag for ice, telling him it was not authorized. Decl. Carter, Ex. 102 at 8. On June 20,

2023, Plaintiff filed three grievances: First, against ODOC generally, alleging that the ibuprofen

container was empty on June 14, 2023, and that after asking the officer, he said "he'd get around

to it," but hours later, the container was still empty. *Id*. at 6. Second, against Defendant Officer

Corey Newton, alleging that Newton refused to provide Plaintiff with a plastic bag for ice that

day, telling Plaintiff that it was not authorized by medical. *Id*. at 4. Third, against Defendant

Meynig, alleging that she had discontinued his Mobic (meloxicam) prescription but did not prescribe anything to replace it. *Id*. at 10. On June 21, 2023, Defendant Meynig wrote Plaintiff a prescription for meloxicam and ordered an office visit for Plaintiff to complete a pain management questionnaire. Decl. Carter, Ex. 101 at 56. On June 22, 2023, Plaintiff filed a grievance against Meynig stating that his Mobic (meloxicam) had not been re-prescribed. Decl. Carter, Ex. 102 at 2.

On July 8, 2023, Plaintiff wrote to Health Services that his plastic bags for ice kept being confiscated and that he was informed by the Grievance Coordinator/ADA Coordinator Joshua Ybarra that he was not authorized to keep the bag in his property but was to return it when not in use. Decl. Carter, Ex. 101 at 62. A nurse responded that they would put an authorization in the computer system and make Plaintiff a "yellow card" for an ice bag. *Id*. On July 10, 2023, Defendant Meynig saw Plaintiff and noted that he was back to taking meloxicam, which had been refilled in June; Plaintiff reported he was okay with the meloxicam for now and was mostly taking it at night for anti-inflammatory purposes. *Id*. at 58. Plaintiff requested Meynig take the following requests to TLC: (1) authorization to sit in a chair in the dayroom and his cell; (2) elevated storage as he cannot bend to get his medications and would like a device that can be raised; and (3) a single cell, which Plaintiff reported his Behavior Health Services (BHS) provider was attempting to assist with. *Id*. Plaintiff also requested that Meynig include the court ruling in her presentation to TLC; Meynig noted that she would present the court documents at the next TLC meeting and that she had filled out the chronic pain management form for the provider-to-provider pain management consult. *Id*. The same day, Plaintiff wrote to Meynig, concerned that the court documents had been returned to him and requesting that she advocate for him at TLC. *Id*. at 63. Meynig responded on July 12, 2023, writing that she had made a copy

of the court documents and included them in the paperwork she was submitting to TLC and that she would do her best to be his advocate. *Id.* at 64. On July 25, 2023, TLC denied all of Plaintiff's requests stating that they were not medically indicated; in attendance were Defendants Meynig, Roberts, Davies, Maney, and O'Hanley. *Id.* at 65-67.

On August 18, 2023, Defendant Dr. Beamer saw Plaintiff and noted that he continued to have complaints regarding sitting on a stool without support and getting items out of his bottom drawers; Plaintiff requested a single cell, which would have a table on which he could place his drawers and other items. *Id.* at 68. Beamer noted that the plan would be to have ADA evaluate Plaintiff for permanent disability accommodations and wrote an order for ADA Coordinator Ybarra to evaluate Plaintiff. *Id.* at 68-69, 73.

On August 24, 2023, Plaintiff wrote to Dr. Beamer and attached a TLC decision from 2013 that he had spoken about during his appointment; Beamer signed the kyte acknowledging receipt. *Id.* at 70-71. On August 29, 2023, Beamer wrote an order requesting ADA Coordinator Ybarra speak with him upon Mr. Ybarra's return from vacation. *Id.* at 72-73. On October 5, 2023, Beamer completed pain management consult paperwork, requesting medication review and discussion about ways to improve function from Dr. Kirk Whitestone. *Id.* at 74.

On November 20, 2023, and December 4, 20203, the first and second days of a three-day trial were held in Plaintiff's Jefferson County habeas corpus proceeding. *Bray v. Randall*, Jefferson County Case No. 23CV15221. At the trial, ADA Coordinator Ybarra testified that Plaintiff had never filled out the ADA request form; rather Mr. Ybarra placed Plaintiff on a callout, met with him, and discussed his need for a chair with back support. Decl. Fisher, Ex. 104 at 8-12. Mr. Ybarra further testified that, during the meeting, Plaintiff filled out the requisite

ADA request form, submitted it that day, and he believed Plaintiff received the chair the

following day. *Id.*; *see also* Decl. Fisher, Ex. 105.

On March 9, 2024, Defendants Officer Schleis and Officer Stone interacted with

Plaintiff, who was in the dayroom sitting in a chair using his seat cushion. The parties disagree

about what happened during this interaction. Defendants assert that Plaintiff was also using the

blanket from his bunk as a seat cushion as padding on the chair. Decl. Fisher, Ex. 106. Defendant

Schleis asserts that he informed Plaintiff the blanket needed to be returned his to bunk and asked

Plaintiff whether he was authorized to have the seat cushion. *Id.* When neither Officer Schleis

nor Plaintiff could find documentation authorizing the seat cushion, Schleis informed Plaintiff

that he would need to contact Health Services and return the seat cushion. *Id.* Rather than follow

those directions, Plaintiff proceeded to throw the seat cushion away. *Id.* By contrast, Plaintiff

contends that he explained to the officers that his cushion was court-ordered and offered to show

them the documentation, but Officer Schleis said he did not want to see the order, indicating that

he would not understand it even if he saw it; Schleis ordered Plaintiff to either throw away the

cushion or return it to medical. Decl. Bray ¶16-18. Plaintiff threw the cushion away. *Id.* at ¶19.

MSM Carter was notified on March 9, 2024, that Plaintiff had been questioned by

Defendant Schleis about the seat cushion, and she informed all involved that the seat cushion

was court-ordered, and if it had been confiscated it should be returned to him immediately. Decl.

Fisher, Ex. 107.

On March 22, 2024, Judge Wade Whiting issued his Opinion in Plaintiff's second habeas

corpus proceeding. *Bray v. Randall*, Jefferson County Case No. 23CV15221. On April 9, 2024, a

nurse contacted Plaintiff to issue his wheelchair and order a new seat cushion. Decl. Carter ¶4.

On April 11, 2024, MSM Carter ordered Plaintiff a seat cushion, which he received on April 18, 2024. Decl. Fisher, Ex. 107. Plaintiff received his wheelchair on April 19, 2024. Decl. Carter ¶4.

    *c.  This case*

Plaintiff alleges two primary, over-arching claims in this case: (1) deliberate indifference to his serious medical needs in violation of the Eighth Amendment, brought against the individually named defendants under 42 U.S.C. § 1983; and (2) violations of the Americans with Disabilities Act (ADA) and § 504 of the Rehabilitation Act brought against the State for allegedly denying him access to institutional programs, services, and activities during his incarceration. Defendants move for summary judgment on all claims.

## DISCUSSION

The Defendants are entitled to summary judgment on all claims; their motion is granted.

## I.  Plaintiff's claims based on acts prior to May 1, 2021, are time-barred; Defendants Gulick and Ortiz are dismissed from the case.

Where a federal law is without an express statute of limitations, courts look to the most analogous state-law claim, so long as "it is not inconsistent with federal law or policy to do so." *Wilson v. Garcia*, 471 U.S. 261, 266-67 (1985) *partially superseded by statute as stated in Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 370-80 (2004); *see also Sharkey v. O'Neil*, 778 F.3d 767 (9th Cir. 2015).

None of the federal laws at issue in this matter have express statutes of limitation. Section 1983 actions are governed by the two-year personal injury statute of limitations in ORS § 12.110. *See Sanok v. Grimes*, 306 Or. 259, 263 (1988) (quoting *Wilson*, 471 U.S. at 276). Courts in the District of Oregon have held that ADA claims for disability discrimination in public accommodations are most analogous to claims under ORS § 659A.142(4) such that the two-year statute of limitations in ORS § 12.110 applies. *See A.F. v. Starbucks Corp.*, 2018 WL 1161385,

at *3 (D. Or. Mar. 5, 2018); *Bunnell v. Brown*, 2018 WL 3040893, at *5 (D. Or. June 19, 2018). Courts have also applied the ORS § 12.110 statute of limitations to Rehabilitation Act claims. *See A.F.*, 2018 WL 1161385, at *2; *Bunnell*, 2018 WL 3040893, at *5; *Ramirez v. Parker*, 2014 WL 7187463, at *12 (D. Or. Dec. 16, 2014). Here, Plaintiff filed his initial Complaint in this matter on May 1, 2023, (ECF #1), thus, all claims arising before May 1, 2021, are barred as untimely.

Plaintiff argues that the doctrine of "continuing violations" operates to allow the older claims in this case to move forward, despite the applicable statute of limitations. Prior to 2002, a plaintiff could invoke the continuing violations doctrine by showing a "series of related acts against one individual." *Gutowsky v. County of Placer*, 108 F.3d 256, 259 (9th Cir. 1997). However, the Supreme Court invalidated the "related acts" method of establishing a continuing violation, stating that "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002) (*Morgan II*). In discussing what little remains of the continuing violations doctrine post-*Morgan II*, the Ninth Circuit has noted that, while the Court left room for the doctrine to apply to "class wide pattern-or-practice claims," "we have consistently refused to apply [it] to rescue individualized claims that are otherwise time-barred." *Bird v. Dep't of Hum. Servs.*, 935 F.3d 738, 748 (9th Cir. 2019). In sum, the continuing violations doctrine is available for hostile work environment-type claims, and systemic, class-wide pattern-or-practice claims.

Here, Plaintiff alleges a series of related, but discrete acts that occurred over the course of months and years, including: being denied the use of a cushion, being denied access to therapeutic ice, experiencing the ibuprofen dispenser on his unit run out of medication, being

told to carry his own chair, and being assigned to a bunk on a top tier for certain periods of time. While these discrete acts are arguably related to the ways that the staff treated Plaintiff's pain and the way he was accommodated, he was not subject to a systemic, policy-based pattern or practice, such as a blanket-ban on any NSAID pain reliever, or any therapeutic ice. Plaintiff's claims are based on discrete acts – acts that he alleges violated the Eighth Amendment, as well as the ADA. Therefore, the continuing violations doctrine does not apply. As stated above, Plaintiff filed his Complaint in this matter on May 1, 2023, thus, all claims arising before May 1, 2021, are time-barred.

The parties previously filed a stipulated motion dismissing Defendants Patton, DiGuilio, Norton, Faulstich, Bugher, Quick, and Coleman. Now Defendants seek dismissal for Defendants Gulick and Ortiz because the evidence shows that all discreet acts taken by both of these defendants occurred prior to May 1, 2021.[4] Defendants' motion is GRANTED as to Defendants Gulick and Ortiz.

## II. Defendants are entitled to summary judgment as to Plaintiff's Eighth Amendment claims brought pursuant to section 1983.

Plaintiff brings claims for violations of the Eighth Amendment via the Civil Rights Act, 42 U.S.C. § 1983 ("section 1983"). Section 1983 does not create rights but provides the vehicle by which federal rights can be enforced. "Traditionally, the requirements for relief under 1983 have been articulated as: (1) a violation of rights protected by the Constitution or created by federal statute, (2) proximately caused (3) by conduct of a 'person' (4) acting under color of state law." *Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991). States are not persons for purposes of § 1983. *See Arizonans for Official English v. Arizona*, 520 U.S. 43, 69 (1997);

---

[4] Plaintiff's Second Amended Complaint (SAC) does contain one further allegation against Ortiz: "On July 30, 2022, Defendant Ortiz denied Plaintiff the use of ice." SAC ¶ 69. Plaintiff has not cited to any evidence in the record to support this allegation, and even if he had, this single fact would be insufficient to show deliberate indifference.

*Stilwell v. City of Williams*, 831 F.3d 1234, 1245 (9th Cir. 2016) (explaining that § 1983 did not abrogate states' Eleventh Amendment immunity and therefore does not allow suits against states themselves). Thus, Plaintiff properly does not allege his § 1983 Eighth Amendment claims against ODOC or the State of Oregon, but against the individual medical staff and correctional officers who interacted with him during his time in custody.

To succeed on an Eighth Amendment claim for inadequate medical care, a plaintiff must demonstrate that each individual defendant showed "deliberate indifference to [his] serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). Deliberate indifference is a "high legal standard." *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004). A mere "difference of medical opinion ... [is] insufficient, as a matter of law, to establish deliberate indifference." *Id.* (quoting *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir.1996)). Rather, to prevail on a claim involving choices between alternative courses of treatment, a prisoner must show that the chosen course of treatment "was medically unacceptable under the circumstances," and was chosen "in conscious disregard of an excessive risk to [the prisoner's] health." *Id.*

Here, the facts in the record do not support Plaintiff's claim for inadequate medical care under the Eighth Amendment. The record shows that Plaintiff made five main categories of requests to attempt to manage his chronic pain. He requested: an assignment to a bottom tier / bottom bunk, daily access to therapeutic ice, a prescription for ibuprofen, a seat cushion and a plastic chair, and a wheelchair. In many cases, the medical providers simply disagreed with Plaintiff that his requests were medically necessary, and Plaintiff has not shown that the providers' decisions were medically unacceptable under the circumstances. In other cases, staff did not, or could not, guarantee him unlimited access to his requested treatment, due to the policies and procedures in place at the prison. As discussed below, the record shows that

anytime Plaintiff's requests were denied, or his access was rescinded, the defendants were not deliberately indifferent to his serious medical needs. Defendants are entitled to summary judgment as to Plaintiff's Eighth Amendment claims.

### A. Bottom Tier / Bottom Bunk

Plaintiff was housed in a bottom tier and bottom bunk during all of his time in custody in 2021. On March 15, 2022, Plaintiff was moved to a top tier. On March 27, 2022, he asked to see a provider, stating that he had been struggling with stairs, which were causing him 10/10 pain. Defendant Patrick Maney, NP, ordered a bottom bunk and lower tier designation for one year, and on June 30, 2022, Plaintiff was moved to a lower tier. Since then, Plaintiff has been assigned a bottom bunk on a lower tier. No evidence exists to show that the delay between Maney's order and Plaintiff's move to a lower tier was a result of any conduct or failure by Maney, nor by any other staff member who was deliberately indifferent to Plaintiff's needs. Defendant Maney is entitled to summary judgment on this issue.

### B. Ice

Plaintiff alleges, and the record supports, that his requests for therapeutic ice date back to November 28, 2012,[5] and yet his access to ice was intermittent at best. However, Plaintiff has not shown that his intermittent access to ice during the applicable period was a violation of his constitutional rights. Plaintiff points to Dr. Kopp's testimony in Plaintiff's Umatilla County Circuit Court habeas case, which stated that, in his expert medical opinion, ice is a "reasonable treatment" for Plaintiff's condition. Levi Decl. Ex. 13, at 78:20-24. However, other providers throughout the record disagreed with this assessment. In 2020, Dr. Gulick's medical opinion was that ice would not help Plaintiff's condition or his pain. *Id.*, Ex. 8 at 4. Multiple other providers,

---

[5] The Court considers the record prior to May 1, 2021, only to the extent that it shows the mental state of the Defendants, and whether or not their conduct after that date was deliberately indifferent to Plaintiff's medical needs.

such as Danette Berg, RN, in 2021, and Tina Hazen, RN, in 2021 and 2022, noted their understanding that ice was only effective for 72-hours, and therefore they approved his request for only that amount of time. As discussed above, differences of medical opinion are insufficient, as a matter of law, to establish deliberate indifference. *Toguchi*, 391 F.3d at 1060 (quoting *Jackson*, 90 F.3d at 332).

Nevertheless, Plaintiff's requests for ice were often granted. On August 9, 2022, the TLC Committee approved long-term ice for Plaintiff. On April 28, 2023, the Umatilla County Circuit Court issued its opinion in Plaintiff's habeas case, ordering that Plaintiff be "allowed access to ice and bags necessary to therapeutically apply the ice." *Id.*, Ex. 3 at 8. Less than two weeks later, Plaintiff asked for a renewal of his ice order, reporting that correctional officers had been denying him bags to apply the ice. Defendant Rebecca Stiff, RN, ordered a chart review. *Id.*, Ex. 2 at 12. The chart review was given by Defendant Katrena Meynig, NP, who ordered ice bags for six months. *Id.*, Ex. 101 at 56. The order was not properly entered into the computer, but when Plaintiff notified Health Services, the error was corrected, and the ice order was renewed through November.

Other technical and systemic difficulties sometimes prevented Plaintiff from accessing ice temporarily. On June 19, 2023, Defendant Officer Stone confiscated the plastic bag that Plaintiff was using to fill with ice. Defendant Officer Schleis confirmed that Plaintiff could not have the bag, and the next day, Defendant Officer Newton refused to give Plaintiff a plastic bag, stating that it was not authorized. Plaintiff filed grievances for these incidents, which were denied. Joshua Ybarra, DCRI's Grievance and ADA Coordinator, told him he had to return the bags after each use. Plaintiff asserts that he continues to struggle to access bags to apply ice, though his only evidence for this assertion is his own declaration.

Plaintiff's arguments imply that this Court should find an Eighth Amendment violation based on his intermittent access to ice while in custody because the Umatilla State Court granted habeas relief and ordered ODOC to provide him with ice. The Court disagrees. The state court found that ODOC had failed to "maintain consistent and unfom [sic] attention to [Plaintiff's] physical condition," resulting in Plaintiff "constantly having to go back to the beginning and re-request the accommodations and treatments that he knows to be effective in managing his condition, [such as ice]." That court found that, overall, the cumulative pattern of conduct and intermittent access showed deliberate indifference by ODOC. The standard for deliberate indifference in this case is inherently different, however, because ODOC is not a defendant as to the § 1983 Eighth Amendment claims. Under § 1983, Plaintiff cannot rely on the cumulative pattern of conduct of the prison staff as a whole, but instead must show that each named defendant, through their own individual actions, violated Plaintiff's constitutional right. *See Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009).

Plaintiff has not raised a question of fact as to whether any of the individual Defendants acted with subjective deliberate indifference in preventing Plaintiff's access to ice. Differences of medical opinion about the efficacy of ice as a therapeutic treatment cannot form the basis for deliberate indifference of medical personnel. *Toguchi*, 391 F.3d at 1060. Similarly, a computer error that was quickly corrected does not show that a defendant made a deliberate choice "in conscious disregard of an excessive risk to [the prisoner's] health." *Id.* As to the three officers who confiscated Plaintiff's ice bags, the undisputed evidence in the record indicates that they did so because the prison has a policy that plastic bags cannot be left in an inmate's cell overnight. This fact does not support Plaintiff's contention that Defendants were deliberately indifferent to Plaintiff's medical needs, rather it shows that they were following the facility's policies, which

exist to keep inmates safe. At most, the failure to ensure that Plaintiff had constant access to bags

for therapeutic ice rises to the level of negligence, which is not sufficient to survive summary

judgment on a claim for an Eighth Amendment violation. *Estelle*, 429 U.S. at 106 (Negligence

"does not become a constitutional violation merely because the victim is a prisoner.").

### C. Nonsteroidal Anti-Inflammatory Drugs (NSAIDs)

The record shows that Plaintiff inconsistently requested Motrin, also known as ibuprofen,

a Nonsteroidal Anti-Inflammatory drug (NSAID), for managing his pain. During certain periods

of time, he was prescribed Mobic (meloxicam), which was effective at managing his pain, and at

least one provider noted that Plaintiff should not take Mobic and Motrin at the same time.

Plaintiff was never specifically denied ibuprofen by any defendant. Nurses and providers

such as Defendant Maney would direct Plaintiff to access the ibuprofen that was available "on

the unit," meaning that it was freely available to all AIC's in a dispenser in his housing unit. *See,

e.g.*, Levi Decl. Ex. 2 at 2, 11. Plaintiff reported that the dispenser in his unit was often empty,

and nurses told him to check with an officer to get it refilled, but there is no evidence that anyone

intentionally denied Plaintiff this medication. Inadequate treatment due to negligence or

inadvertence does not rise to the level of a constitutional violation. *Estelle*, 429 U.S. at 105-06.

One of Plaintiff's specific claims is that Defendant Meynig was deliberately indifferent to

his medical needs because she discontinued his Mobic prescription without prescribing Motrin or

anything else in its place. On March 30, 2023, at DRCI, Plaintiff requested a medication change

from his currently prescribed NSAID, Mobic, to Motrin. *Id.*, Ex. 7 at 7; *Id.*, Ex. 11. On May 23,

2023, he met with Meynig and requested extra-strength Motrin. *Id.*, Ex. 7 at 8. She told him that

she did not see Motrin as a formulary option but would "investigate" the matter. *Id.* Based on his

conversation with Meynig, and with the sick-call nurse, Plaintiff understood that he needed to

turn in his Mobic prescription before receiving another NSAID prescription for something as effective or more effective than Mobic.

However, as discussed above, and based on the correspondence in the record, medical providers do not prescribe Motrin, because it is freely available in the dispenser on the unit. Therefore, if Plaintiff wanted to take Motrin instead of Mobic, as he told Defendant Meynig, he could do that without a prescription. Meynig's actions – discontinuing Plaintiff's Mobic prescription, when he asked her to do so, and referring Plaintiff to the officers for inquiries about the ibuprofen dispenser on the unit, do not show deliberate indifference to any medical need.

On April 28, 2023, the Umatilla County Circuit Court issued an opinion in Plaintiff's state habeas case, ordering ODOC to provide Plaintiff with access to ibuprofen for pain management. Ex. 3 at 8. On June 14, 2023, Plaintiff asked Defendant Officer Schleis to refill the ibuprofen dispenser. Schleis said that he would do so, but Plaintiff noted that "the dispenser was still empty many hours later." Decl. Levi, Ex. 8 at 21. Plaintiff asserts that Schleis was deliberately indifferent, because he should have known about the Umatilla Court order and should have ensured that the dispenser was refilled without delay. However, the standard for deliberate indifference is subjective, not objective, knowledge. "Constructive notice" is insufficient to show deliberate indifference under the Eighth Amendment. *Farmer v. Brennan*, 511 U.S. 825, 841 (1994). No evidence exists to show that Schleis actually knew of the Umatilla Court Order, which was directed to ODOC, not to Schleis individually.[6] The only action alleged against Defendant Schleis – that he did not quickly refill the ibuprofen dispenser, which serves all inmates on the unit, does not demonstrate deliberate indifference.

---

[6] The Court is sensitive to the difficulty of bringing a claim under these circumstances, but Plaintiff is not without recourse. If Plaintiff believed that ODOC was in violation of the Umatilla Circuit Court's order, it would have been appropriate to raise that issue there, in that court, against that defendant.

On June 18, 2023, Plaintiff asked Defendant Meynig to re-prescribe Mobic because the ibuprofen dispenser was always empty. Decl. Levi, Ex. 2 at 17. On June 20, 2023, Meynig had still not re-prescribed Mobic. *Id.*, Ex. 8 at 22. This failure to re-prescribe, or possibly a delay in re-prescribing, a medication that Plaintiff told her was ineffective does not amount to deliberate indifference of a serious medical need. None of the actions, or inactions, of the Defendants regarding Plaintiff's access to ibuprofen, rise to the level of a constitutional violation.

### D. Seat cushion and plastic chair

In the cells and dayrooms at TRCI and DRCI, the primary places to sit are steel stools. Decl. Levi, Ex. 13 at 142:24-143:12. Plaintiff is unable to sit on the stools without pain. *Id.*, Ex. 2 at 18. Plaintiff requested a foam seat cushion to use to sit on the stools on October 2, 2022. Decl. Carter, Ex. 101 at 26. Defendant Beamer put his request in front of the TLC Committee, but the TLC Committee denied the request. Decl. Levi, Ex. 10 at 3; Decl. Carter, Ex. 101 at 30. Over the next couple of months, DRCI medical staff, including Defendant Beamer, documented Plaintiff's continued sacroiliac joint pain and difficulty sitting on hard surfaces. *Id.* at 25; Decl. Levi, Ex. 7 at 9. Defendant Beamer later characterized Plaintiff's pain and disability as "way beyond what [he'd] ever witnessed." *Id.*, Ex. 13 at 199:23-24. Nevertheless, on February 14, 2023, the TLC Committee denied Plaintiff's request for a cushion again, stating that it was "not medically supported." *Id.*, Ex. 10 at 4. Defendants Roberts, Maney, Dr. Peter O'Hanley, and NP Michele Davies were on the committee. *Id.* at 5.

Two days later, on February 16, 2023, Plaintiff requested permission to sit in a plastic chair when using the dayroom tables, so that he would not have to use the more painful steel stools. Decl. Levi, Ex. 2 at 19. DRCI had plastic chairs in the dayroom already, but their use was restricted to inmates making phone calls or watching television and were not for use at the tables.

*Id.*, Ex. 2 at 18-19. Inmates were prohibited from moving the chairs without a medical note or ADA accommodation. *Id.* at 18. A staff member responded to Plaintiff's request on February 19, 2023, indicating that the request would be forwarded to the provider, and recommending that Plaintiff send a kyte to the ADA coordinator. *Id.* at 18. There is no evidence in the record that Plaintiff made an ADA-specific request at that time.

On April 28, 2023, the Umatilla County Circuit Court issued its opinion on Plaintiff's habeas petition, ordering ODOC to provide Plaintiff with a seat cushion. *Id.*, Ex. 3 at 8. About a week later Plaintiff received a cushion. *Id.*, Ex. 2 at 4.

On June 28, 2023, Plaintiff again requested permission to use a plastic chair. *Id.*, Ex. 8 at 2. He stated that he tried sitting on his cushion on the steel stools, but it was not enough to relieve his pain. *Id.* On July 25, 2023, the TLC Committee denied his request to use a chair, finding that there was "[n]o medical indication" for it. Decl. Carter, Ex. 101 at 65. Defendants Roberts, Davies, Maney, O'Hanley, and Meynig were on the TLC Committee for that decision. *Id.* On August 18, 2023, Plaintiff again asked to use a plastic chair, and was again denied. Decl. Levi, Ex. 8 at 15.

As discussed above, differences of medical opinion about the efficacy of a specific treatment cannot form the basis for deliberate indifference of medical personnel. *Toguchi*, 391 F.3d at 1060. Here, Plaintiff has shown that he was in pain and that he believed that first a cushion, and then a plastic chair, would make him more comfortable in the day room, but he has not shown that the Defendants on the TLC Committee's repeated denials of his requests for a cushion were medically unacceptable choices under the circumstances, nor that they were chosen in conscious disregard of an excessive risk to Plaintiff's health. Similarly, after the TLC Committee granted Plaintiff's request for a seat cushion, it was not unreasonable for them to

determine that the plastic chair was not medically necessary. None of these decisions rise to the level of a constitutional violation.

On November 20, 2023, the Jefferson County Circuit Court began trial in Plaintiff's second habeas case. While these proceedings were ongoing, Plaintiff received ADA authorization to use a plastic chair in his cell,[7] in the dayroom, and in the dining hall. Plf Resp. (ECF #73) at 20 (citing Levi Decl., Ex. 13 at 232:10-14, 233:6-8).

On February 21, 2024, Defendant Officer Corey Newton told Plaintiff that he had to put his chair away behind the bookshelf in the dining hall and threatened him with "progressive discipline" if he did not comply. Decl. Levi, Ex. 8 at 27. Invoking the ADA, Plaintiff explained that he could not lift the chair over the bookshelf as would be required to put it away, nor could he lift the chair back over the bookshelf when he next needed it. *Id.* at 27-28. ADA Coordinator Ybarra denied his grievance on the matter, stating that Plaintiff did not have any lifting restrictions in his file. *Id.*, Ex. 8 at 7.

Plaintiff challenges this conclusion by pointing to the report written by Dr. Kopp in 2013, indicating that Plaintiff is disabled and unable to work. *See* Levi Decl. Ex. 1. In that report, Dr. Kopp stated that Plaintiff self-reported that "he has trouble lifting; and he says an example is that he can't lift a gallon of milk." *Id.* at p. 3. However, Dr. Kopp's own assessment did not provide any lifting restrictions. Additionally, even if Dr. Kopp opined such a restriction, it is unclear how such an opinion – which expressly applies to Plaintiff's employment as an anesthesiologist,

---

[7] Plaintiff asserts that he could not actually use the chair in his cell, because it was too small and there was not enough room for him or his cellmate to get dressed. On December 19, 2023, Plaintiff asked for a single-person ADA cell to facilitate the use of his chair. *Id.*, Ex. 2 at 20. He was denied. *Id.* It is unclear whether Plaintiff intends to assert a claim under the Eighth Amendment as to these facts, considering his initial requests for the chair were meant for use in the dayroom, not in his cell. If he does intend to assert such a claim, it fails because there is no evidence in the record that he had a medical need to use the chair in his cell, nor is there any evidence that any Defendant was deliberately indifferent to his medical needs by denying such a request.

would transfer to the prison setting. None of the other medical records in the record before the Court support Plaintiff's alleged inability to lift a plastic chair once or twice per day. Therefore, the officer's request for Plaintiff to lift the plastic chair in order to put it away was not deliberately indifferent to Plaintiff's medical needs.

On March 9, 2024, Defendants Officer Schleis and Officer Stone interacted with Plaintiff, who was in the dayroom sitting in a chair using his seat cushion. The parties disagree about the facts surrounding this interaction. The Defendants assert that Plaintiff was using the blanket from his bunk with a seat cushion as padding on the chair. Decl. Fisher, Ex. 106. Officer Schleis asserts that he informed Plaintiff the blanket needed to be returned his to bunk and asked Plaintiff whether he was authorized to have the seat cushion. *Id.* When neither Schleis nor Plaintiff could find documentation authorizing the seat cushion, Schleis claims that he informed Plaintiff that he would need to contact Health Services and return the seat cushion. *Id.* Rather than follow those directions, Plaintiff proceeded to throw the seat cushion away. *Id.* By contrast, Plaintiff contends that he explained that his cushion was court-ordered and offered to show the officers documentation of the order, but Schleis said he did not want to see the order, indicating that he would not understand it even if he saw it; he ordered Plaintiff to either throw away the cushion or return it to medical. Decl. Bray ¶16-18. Plaintiff threw the cushion away. *Id.* at ¶19.

Regardless of the dispute of fact above, it is undisputed that MSM Carter was notified on March 9, 2024, that Plaintiff had been questioned by Schleis about the seat cushion, and she informed all involved that the seat cushion was court-ordered, and if it had been confiscated it should be returned to him immediately. Decl. Fisher, Ex. 107. On March 11, 2024, Plaintiff filed a grievance against Officers Schleis and Stone for this incident and requested a replacement

cushion. Decl. Levi, Ex. 8 at 29. Plaintiff received a new cushion on April 18, 2024. Decl. Fisher, Ex. 107 at ¶5.

Once again, this incident does not rise to the level of a constitutional violation for inadequate medical care, even if Plaintiff's version of the facts is presumed to be true. There is no evidence that officers had seen the court order for Plaintiff's cushion, and they did not see authorization for it in the prison computer records. MSM Carter followed up that same day to fix the problem. Plaintiff was allowed to use the plastic chair, and his cushion was replaced within a reasonable amount of time. The temporary deprivation of an accommodation, which Plaintiff had stated was not very effective, does not rise to the level of a constitutional violation.

On February 19, 2025, Officer Denton approached Plaintiff in the dayroom and told him that he was not authorized to use the plastic chair. Decl. Levi, Ex. 8 at 1. Plaintiff responded that it was court-ordered. *Id.*; Decl. Levi, Ex. 15 at 5. Officer Denton stated that it was not in the computer system. *Id.*, Ex. 8 at 1. As a result, Plaintiff was prevented from using the chair for two and a half days. *Id.* at 30. On February 25, 2025, after Officer Denton had been shown that Plaintiff's chair was authorized by the ADA, Officer Denton told him that he was only allowed to use the chair if he stored it in his cell and transported it to and from the dayroom himself. *Id.* Plaintiff physically struggles to carry his chair back and forth from his cell and doing so exacerbates his pain. *Id.*; Decl. Bray ¶11. Officer Denton is not a named defendant in this case, and this claim fails for the same reasons discussed above regarding the lack of medical evidence in the record of any lifting or carrying restrictions.

### E. Wheelchair

On August 3, 2022, Plaintiff's pain had gotten "so horrific" that he wrote to Defendant Maney, requesting an appointment and asking for a wheelchair. Decl. Levi, Ex. 2 at 24.

Defendant Hazen told him to discuss it at his next appointment. *Id*. On August 31, 2022, Plaintiff

wrote that his pain remained severe and that he was "100% unable to sit on the steel stools,"

even offering to self-pay for a wheelchair. *Id*. In response, Hazen reminded him that Maney had

informed Plaintiff on July 31, 2022, that his care was in process with testing and imaging and

asked Plaintiff to please be patient. *Id*. Hazen's response was not deliberately indifferent to

Plaintiff's medical needs because she appropriately responded to his request, directed him to take

further steps towards his desired outcome, and encouraged him to be patient with the process.

About a week later, Plaintiff was transferred to DRCI without a wheelchair. Decl. Brown,

Ex. 103; Decl. Carter ¶4. He was assigned to work in the education building, which was at the

bottom of a hill. Decl. Levi, Ex. 13 at 143:12-20. On January 4, 2023, Plaintiff told Defendant

Beamer that he could not "tolerate the slopes and hills anymore" and asked for a wheelchair. *Id*.,

Ex. 2 at 26. Beamer asked the TLC Committee to review his wheelchair order for Plaintiff Decl.

Carter, Ex. 101 at 35. The TLC Committee denied the request. Decl. Levi, Ex. 10 at 6.

Defendants Roberts, Davies, and Maney were on the committee. *Id*. at 7. On January 23, 2024,

the TLC Committee again denied Plaintiff's request for a wheelchair. *Id*., Ex. 4 at 6-7.

On March 23, 2024, the Jefferson County Circuit Court issued its ruling on Plaintiff's

state habeas case. *Id*. at 7. Judge Whiting ordered DRCI to provide Plaintiff with a wheelchair,

*id*., and on April 19, 2024, Plaintiff received one. Decl. Carter ¶4.

Plaintiff points out that Judge Whiting found that DRCI acted with deliberate indifference

in failing to provide Plaintiff with a wheelchair, implying that this Court should similarly find

that the defendants in this case were deliberately indifferent. However, as discussed above, the

legal standards are not the same, nor are the defendants. The State's deliberate indifference in the

context of a habeas case does not implicate any specific individual's liability in the context of a

case arising under § 1983. The State is not a "person" under § 1983 and the Eleventh

Amendment bars Plaintiff's claims against the State in federal court for monetary damages.

Here, Plaintiff has not shown that any individual defendant made a choice to deny his request for

a wheelchair that was medically unacceptable under the circumstances and was chosen in

conscious disregard of an excessive risk to Plaintiff's health.

### F. Individual Defendants

Several of the named defendants have not yet been specifically discussed, and the Court

addresses the allegations against them below. Plaintiff has failed to submit evidence that raises a

question of fact as to whether any of these defendants took any purposeful act or failed to

respond, with deliberate indifference, to conditions that posed a risk of objectively serious harm.

First, the SAC contains only one substantive allegation against Defendant Marilyn

Mendoza, RN: "On October 27, 2021, Defendant Mendoza denied Plaintiff the use of ice." SAC

¶66. Plaintiff has not cited to any evidence in his brief to support this allegation, and even if he

had, this fact would be insufficient to show deliberate indifference. Defendant Mendoza is

entitled to summary judgment.

Second, allegations involving Defendant Dr. Leland Beamer are scattered throughout the

claims above. Plaintiff saw Dr. Beamer multiple times and communicated with him in writing

and in person about his struggles with pain and various accommodations. Dr. Beamer was not

deliberately indifferent to Plaintiff's medical needs. To the contrary, the record shows that Dr.

Beamer was responsive to Plaintiff's pain and his concerns, and that Beamer took Plaintiff's

requests to the TLC committee as requested. The only time Dr. Beamer was not responsive to

Plaintiff was when he was reported to be on vacation, and Plaintiff was directed to go to sick call

until he returned. Plaintiff has not shown any question of fact regarding whether Beamer was

deliberately indifferent to his medical needs. Defendant Beamer is entitled to summary judgment.

### III.   Qualified immunity

Because the defendants did not violate Plaintiff's constitutional rights, there is no need for the Court to address whether such rights were "clearly established" for purposes of qualified immunity. *See Pearson v. Callahan*, 555 U.S. 223, 242 (2009).

### IV.   Plaintiff has not raised a question of fact as to whether ODOC violated the ADA.

Unlike the Eighth Amendment claims, brought pursuant to section 1983, against individual defendants, Plaintiff brings his ADA claim against the State of Oregon, as embodied by the Oregon Department of Corrections (ODOC).

The ADA applies in the prison context to prohibit discrimination against inmates with disabilities. *United States v. Georgia*, 546 U.S. 151, 154 (2006). To prove an ADA Title II claim, an inmate must establish that: "(1) he is an individual with a disability; (2) he is otherwise qualified to participate in or receive the benefit of some public entity's services, programs, or activities; (3) he was either excluded from participation in or denied the benefits of the public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (4) such exclusion, denial of benefits, or discrimination was by reason of his disability." *O'Guinn v. Lovelock Corr. Ctr.,* 502 F.3d 1056, 1060 (9th Cir. 2007); 42 U.S.C. § 12132. To recover monetary damages under Title II of the ADA or under the Rehabilitation Act, a plaintiff must prove intentional discrimination on the part of the defendant under a deliberate indifference standard. *Duvall v. County of Kitsap*, 260 F.3d 1124, 1138 (9th Cir. 2001).

### A. Allegations contained in the Second Amended Complaint.

Plaintiff alleges that he is an individual with a disability, due to his back and hip pain and limited mobility. He claims that he was "he was denied many programs, services, and activities available to the prisoners, e.g., recreational yard time, common room time, job programs, meals, etc.," due to his inability to walk or sit. Specifically, Plaintiff claims that Defendant ODOC violated the ADA by "by failing to provide medical care to manage Plaintiff's chronic pain conditions, failing to lodge him in a bottom tier and bottom bunk for years, and by failing to provide him with a seat cushion and a wheelchair." SAC ¶94.

As a preliminary matter, a claim for inadequate medical care or lack of treatment cannot support liability under the ADA – such a claim is more appropriately addressed under the Eighth Amendment, and in this case that claim fails for the reasons discussed above. Additionally, Plaintiff does not appear to seek injunctive relief as to the alleged violations of the ADA. That makes sense, considering that his requests – the specific violations identified above – have ultimately been granted already.

As to monetary damages, in order to survive summary judgment, Plaintiff must raise a question of fact regarding ODOC's intentional discrimination, under a deliberate indifference standard. Here, after an exhaustive review of the facts, the Court finds that there is simply no evidence of intentional discrimination in the record. Viewed in the light most favorable to Plaintiff, the facts cumulatively amount to some level of systemic incompetence, certainly, and a failure to have a streamlined process between medical services and ADA services. Such a failure may rise to the level of negligence, but does not meet the deliberate indifference standard, nor does it support a claim of intentional discrimination.

Setting aside the claim for inadequate medical care, the facts in the record do not support a claim for deliberate indifference as to the other specific ADA violations alleged. As to the request for a bottom tier and bottom bunk, the record shows that this accommodation was generally provided to Plaintiff during the applicable period. He was assigned to a lower tier and bottom bunk in 2021. On March 15, 2022, Plaintiff was moved to a top tier. *Id.* On March 27, 2022, he asked to see a provider, stating that he had been struggling with stairs, which were causing him 10/10 pain. Decl. Carter, Ex. 101 at 4. Defendant Patrick Maney, NP, ordered a bottom bunk and lower tier designation for one year, and on June 30, 2022, Plaintiff was moved to a lower tier. *Id.* at 5-6. Since then, Plaintiff has been assigned a bottom bunk on a lower tier. A temporary assignment to a top tier, and a response and re-assignment to a bottom tier within a reasonable amount of time, do not amount to deliberate indifference or intentional discrimination.

As to the failure to provide a seat cushion, medical services staff denied the request as not medically necessary, but there is no evidence in the record that Plaintiff made an ADA-specific request for this item. After the Umatilla County Circuit Court ordered ODOC to provide a cushion, one was provided. These facts do not support intentional discrimination or deliberate indifference.

As to the failure to provide a wheelchair, the same reasoning applies. There are many reasons an institution may not be able to provide a wheelchair for an inmate who is physically capable of walking. After the Jefferson County Circuit Court ordered ODOC to provide a wheelchair, one was provided. These facts do not support intentional discrimination or deliberate indifference.

**B. Allegations raised in Plaintiff's Response.**

Plaintiff's Response brief alleges that, despite his disability, his request for "sedentary" work accommodations went ignored. Pl.'s Resp., at 24 (ECF #73). At the time, Plaintiff was working as a tutor, which he admits was a suitable job for his medical conditions, but he became aware in early 2021 that classroom tutors were being reassigned to work in the kitchens. There is no evidence in the record, however, that Plaintiff was ever actually reassigned from his role as a tutor. On April 2, 2023, Defendant Dr. Beamer ordered that Plaintiff be restricted to "sedentary work only," as he requested. Thus, Plaintiff was not excluded from participation in or denied benefits of programs, services, or activities or otherwise discriminated against, as required to state a claim for relief.

Once again, this record fails to support any claim of discrimination under the ADA.

**ORDER**

The Defendants' motion for summary judgment (ECF #64) is granted in full. Judgment shall be entered for the Defendants.

IT IS SO ORDERED and DATED this __11__ day of December, 2025.

MARK D. CLARKE
United States Magistrate Judge